# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| ELI LILLY AND COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:08-cv-01720-TWP-TAB |
| | ) |
| VALEANT PHARMACEUTICALS | ) |
| INTERNATIONAL. | ) |
| | ) |
| Defendant. | ) |

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 44)

This case comes before the Court on Plaintiff and Counterclaim Defendant Eli Lilly and Company's ("Lilly") Motion for Partial Summary Judgment (Dkt. 44). Lilly seeks Declaratory Judgment against Defendant Valeant Pharmaceuticals International ("Valeant"), declaring the proper interpretation of Valeant's costs sharing obligations, and whether costs of defense are included in the shared costs provision of the Letter Agreement entered into by the parties. Lilly's Motion for Partial Summary Judgment is **GRANTED**.

## I. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment. Under Rule 56(c), summary judgment is appropriate and Lilly is entitled to a judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). As articulated by the Supreme Court, "summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole." *Id.* at 327. In ruling on a motion for summary judgment, the admissible evidence

presented by the non-movant must be believed and all reasonable inferences must be drawn in their favor. *Zerante v. DeLuca*, 555 F. 3d 582, 584 (7th Cir. 2009).

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex*, 477 U.S. at 323. When the moving party produces *proper support of its motion*, the burden then shifts to the non-movant. It is not enough for the non-movant merely to raise factual arguments that cast "some metaphysical doubt as to the material facts." *Baker v. Elmood*, 940 F. 2d 1013 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A party who bears the burden of proof on a particular issue must affirmatively demonstrate, through specific factual allegations, that there is a genuine issue of material fact that requires trial. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted).

## II. FACTUAL BACKGROUND

In 1989, Lilly began manufacturing pergolide mesylate, under the U.S. brand name Permax® ("Permax"). Permax is a medicine developed by Lilly that was approved by the Federal Drug Administration for managing the symptoms of Parkinson's disease.

Beginning in 1993, Lilly sold the rights to market and promote Permax in the United States to third parties. On March 29, 2002, Lilly and Amarin Corporation ("Amarin") entered an Amended and Restated License and Supply Agreement ("Amended Agreement") pursuant to which Lilly granted Amarin the exclusive license to use, promote, market and sell Permax in the United States. The Amended Agreement provided for the quantities and costs of the Permax Lilly would manufacture and supply to Amarin. Amarin was also granted the exclusive license to use Lilly's registered trademark for Permax in the United States.

2

Article 16 of the Amended Agreement dealt with the assignment or subcontracting of the parties' rights and/or responsibilities under the contract. Section 16.1 of the Amended Agreement states that except as provided for in a separate provision, neither party may assign its rights or obligations under the Amended Agreement without prior written authorization of the other party, except that consent to an assignment is not required where a third party is acquiring all or "substantially all" of Lilly or Amarin's business.

On February 11, 2004, Valeant entered into an Asset Purchase Agreement with Amarin, paid Amarin $38 million and purchased assets of Amarin's subsidiary, including Amarin's rights under the Amended Agreement. On the same day[1], Lilly, Valeant and Amarin entered a letter agreement ("Letter Agreement") in which Lilly consented to Amarin assigning its rights and obligations under the Amended Agreement to Valeant.[2]

As reflected in the contract itself, at the time the Letter Agreement was entered into, there were pre-existing product liability claims regarding Permax that had been asserted against Lilly for which Lilly had paid or incurred costs of defense and settlement amounts.[3] The Letter Agreement provided that Amarin would pay to Lilly an aggregate sum of $928,646.20 in satisfaction of (i) amounts due Lilly for product that had been shipped to Amarin by Lilly, and (ii) amounts claimed by Lilly on account of costs of defense and settlement amounts paid or

---

[1] On February 9, 2004, Lilly drafted the first draft of the proposed agreement and circulated it to Valeant and Amarin. One of the provisions related to how the costs for product liability claims would be handled.

[2] It is undisputed that Valeant did not promote, distribute, sell or market Permax prior to its February 25, 2004 acquisition from Amarin of the exclusive license to market Permax in the United States, nor did it gain the right to maintain the new drug application ("NDA") or right to manufacture Permax.

[3] Lilly has redacted the name of the case that was included in the original Letter Agreement and has substituted the term "B Claim". The term "B Claim" refers to a product liability claim that was asserted against Lilly and others and which was settled pursuant to a settlement agreement containing a confidentiality clause that prohibits Lilly from identifying the case or its parties by name.

incurred by Lilly to date in connection with Permax product liability claims asserted against Lilly prior to the date of the letter.

In addition to addressing the costs incurred for past product liability claims as between Amarin and Lilly, the Letter Agreement also included provisions relating to indemnification, as well as provisions relating to sharing costs of pending and future product liability claims as defined by the Letter Agreement. These provisions are the subject of this lawsuit.

For approximately four years and approximately sixteen claimants, Lilly and Valeant managed claims relating to bodily injury or death caused by the use of Permax and shared the costs of settlement as set out in Section 10.3 of the Letter Agreement. In some claims Lilly and Valeant obtained counsel who jointly represented both parties, and also counsel who represented each party in its individual capacity. Throughout the years the parties shared the settlement costs for Product Liability Claims in accordance with the schedule in Section 10.3.

Section 10.3 of the Letter Agreement provides in its entirety:

> In the event of any Claim primarily related to bodily injury or death alleged to have been caused by use of Permax sold in the Territory, regardless of the legal theory under which such Claim is made, (a "Product Liability Claim"), Lilly and Valeant shall share the costs of such Claim in accordance with the following schedule:

| **Date Claim First Made** | **Lilly Share** | **Valeant Share** |
|---|---|---|
| March 22, 2002 - December 31, 2004 | 75% | 25% |
| January 1, 2005 - December 31, 2006 | 50% | 50% |
| January 1, 2007 - December 31, 2008 | 25% | 75% |
| Thereafter | 0% | 100% |

> A Product Liability Claim shall be deemed made when either party first receives written notice evidencing a person's intent to make a Product Liability Claim. Notwithstanding the foregoing, (i) Lilly agrees not to seek indemnification with respect to (A) any Product Liability Claim which was finally settled by Lilly

4

> prior to the date of the Letter Agreement, and (B) any of the costs of defense incurred by Lilly in connection with [B Claim] (but not costs of settlement or damages, which shall be allocated in accordance with the formula above), and (ii) Lilly shall bear 100% of the cost of any Product Liability Claim that is primarily the result of the failure of any Permax manufactured by Lilly to meet specifications at the time of shipment from Lilly's facility.

Letter Agreement, Sec. 10.3.

During the relevant period, Lilly sent notice to Valeant invoking its rights to indemnification under Paragraph 7/10.4 of the Letter Agreement and Section 10.3 under the Amended Agreement. At various times after entering the Letter Agreement, Lilly and Valeant shared limited information regarding the costs of defense that each had incurred, and had brief discussions regarding the parties' reconciliation of costs. In February 2007, Lilly and Valeant were named as defendants in the O Claim[4], a product liability lawsuit. Valeant filed a motion for summary judgment in February 2008, on the basis that Valeant did not sell or distribute Permax to the plaintiff and thus could not be liable to the plaintiff. On August 6, 2008, the court found that the plaintiff's last prescription of Permax was filled before Valeant acquired the rights to distribute Permax and granted summary judgment in Valeant's favor. Thereafter, Lilly entered a settlement agreement for the O Claim and Valeant informed Lilly that, in light of the summary judgment, Valeant would not contribute funds toward the O Claim as set out by the schedule in Section 10.3 of the Letter Agreement.

After commencing this action, on June 9, 2009, Lilly tendered to Valeant a request for payment of Valeant's share of the costs of the Product Liability Claims incurred by Lilly through March 31, 2009, less the amount of Lilly's share pursuant to the terms of the Letter Agreement of the costs of the Product Liability Claims incurred by Valeant.

---

[4] Pursuant to the settlement agreement in this claim, the name of the plaintiff has been omitted.

Lilly now seeks declaratory judgment concluding the following: (1) Valeant's cost-sharing obligations with respect to Product Liability Claims under the February 25, 2004 Letter Agreement between Lilly and Valeant are based exclusively upon the date on which either party first receives written notice evidencing a person's intent to make a Product Liability Claim, and such obligations survive Valeant's dismissal or otherwise prevailing on the merits of a litigated Product Liability Claim and (2) the costs of the Product Liability Claims that are to be shared pursuant to the schedule in Section 10.3 of the Letter Agreement include the following: amounts paid in settlement of the Product Liability Claim, any judgment entered against Lilly and/or Valeant in the Product Liability Claim, and the costs of defense incurred by Lilly and/or Valeant in connection with the Product Liability Claim, including attorneys fees, expert fees, and expenses.

### III.  DISCUSSION

As conceded by the parties, the applicable substantive law to be applied to the contract is that of the State of Delaware. Under Delaware law, contract construction is a question of law. *Rhone-Poulenc Basic Chems. Co. v. Amer. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del. 1992). In interpreting a contract, the court strives to determine the parties' shared intent, "looking first at the relevant document, read as a whole, in order to divine that intent." *Matulich v. Aegis Comm'ns Group, Inc.*, 2007 WL 1662667, at *4 (Del. Ch. May 31, 2007) (quoting *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. Supr. 1996)). When construing a contract, a more specific provision prevails over a more general one. *Towerhill Wealth Management LLC v. Bander Family Partnership, LP*, 2010 WL 2284943, at *10 (Del. Ch. June 04, 2010); *see also Brinckherhoff v. Tex. E. Prod. Pipeline Co., LLC,* 986 A.2d 370, 387 (Del. Ch. 2010).

"When the issue before the court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous." *Firemen's Ins. Co. of Washington, D.C. v. Birch Pointe Condominium Ass'n, Inc*., 2009 WL 1515550, at *2 (Del. Ch. May 29, 2009). "Ambiguity does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends.'" *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992) (quoting *Holland v. Hannan,* 456 A.2d 807, 815 (1983)). Further, a contract provision is not ambiguous simply because the parties disagree on its meaning; contract language is ambiguous only if it is reasonably or fairly susceptible of two or more different interpretations. *Global Energy Finance LLC v. Peabody Energy Corp*., 2010 WL 4056164, at *17 (Del. Super. October 14, 2010).

Under Delaware law, if a contract is unambiguous on its face, parties' rights under such contract should be determined solely by terms expressed in the instrument itself rather than from any extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. *Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, 423 F.3d 145 (2d Cir. 2005). Where ambiguity is found, the court must consider extrinsic evidence to correctly interpret the contractual terms, and thus judgment as a matter of law is inappropriate. *See Eagle Industries, Inc., DeVilbiss Health Care Inc*., 702 A.2d 1228, 1232 (Del. 1997).

**A. Claim v. Product Liability Claim**

The Court begins its analysis by examining the terms Claim and Product Liability Claim. The plain meaning of a contract, as it would be understood by a reasonable person reading the contract, is controlling in disputes over contract interpretation. *In re NextMedia Investors, LLC*, No. 4067-VCS, 2009 WL 1228665, at *6 (Del. Ch. May 06, 2009).

The term Claim ("<u>Claim</u>") is defined in the Letter Agreement as: "any and all liabilities, claims, suits, damages, losses, costs or expenses (including reasonable attorneys' fees and other costs of defense)." The term Product Liability Claim ("<u>Product Liability Claim</u>") is defined as:

> **Claim** [any and all liabilities, claims, suits, damages, losses, costs or expenses (including reasonable attorneys' fees and other costs of defense)] primarily related to bodily injury or death alleged to have been caused by use of Permax sold in the Territory, *regardless of what legal theory under which such* **Claim** *is made*.

Letter Agreement, Sec. 10.3 (emphasis added).

The Court particularly notes the word choice selected by the parties; the definition of a Product Liability Claim uses the previously defined term "Claim" twice. The use of the term Claim within the definition sheds light on the fact that a Product Liability Claim is a further defined subset of the general term Claim – differentiated from other Claims by the fact that it is primarily related to bodily injury or death, allegedly caused by the use of Permax.

### B. "Costs" Obligation Under the Letter Agreement

Lilly contends that the Letter Agreement can be assessed based solely on the four corners of the contract and that the word "costs" is intended to be broad and to include all costs of defense.[5]

Valeant contends that the Letter Agreement suffers from a latent ambiguity because the term "costs" is undefined. Valeant argues that the term "costs" is not defined in the Letter Agreement or the Supply Agreement which it amends, and that Lilly's interpretation conflicts with Delaware courts' narrow interpretation of the term "costs". *See e.g. Comrie v. Enterasys Networks, Inc.*, No. 129254, 2004 WL 936505 (Del. Ch. April 27, 2004). However, Delaware

---

[5] Lilly contends that this term includes settlements, judgments/damages, and all costs of defense, which would include attorneys' fees, expert fees and all other expenses incurred in connection with the defense of the claims.

courts have recognized that the scope of "costs" to be allowed may be expanded by agreement of the parties. *Id*. at *4.

Lilly cites to the language used in the contract as well as the delineation of exceptions in certain circumstances as support for this claim; particularly the language used in discussing the B Claim. In the Letter Agreement, the parties agreed that, "*Notwithstanding the foregoing* … (i) Lilly agrees not to seek indemnification with respect to … (B) any of the *costs of defense* incurred by Lilly in connection with [the B claim]…." Letter Agreement, Section 10.3 (emphasis added). Valeant responds by asserting: 1) that the reference to defense costs in B Claim is clearly not the type of "explicit" statement that would allow a court applying Delaware law to deviate from the American Rule, 2) like the reference to "costs," the reference to "defense costs" in B Claim does not include attorneys' fees, and 3) at most, the reference to "defense costs" in B Claim could mean jointly retained local counsel fees that Lilly had fronted pursuant to the joint representation agreement in that case. The Court respectfully disagrees.

Section 10.3 sets out a schedule regarding the "costs of such Claim," not a schedule for costs. As previously noted, a Claim is a defined term that includes liabilities, damages, but also includes *costs of defense*.[6] This is distinguishable from the circumstances of *Comrie*, where plaintiffs sought attorneys' fees, disbursements, court costs, expert witness fees and taxable fees and expenses in connection with services rendered by a litigation support firm, all based on the agreement's use of the word "costs". *Compare Comrie*, 2004 WL 936505, at *1 (agreement stated in relevant part: "[I]n any action or suit to enforce any right or remedy under this Agreement or to interpret any provision of this Agreement, the prevailing party shall be entitled

---

[6] The language in Section 10.3 provides in relevant part, "Lilly and Valeant shall share the costs of **such** Claim in accordance with the following schedule . . ." The term 'such' relates back to the delineated subset of Product Liability Claim.

9

to recover its costs, including reasonable attorneys' fees."), *with HCR-Manor Care v. Fugee*, 2010 WL 780020, at *6 (Del. Super. January 26, 2010) (finding attorney's fees would be warranted in a collection suit where the agreement provided that if account was turned over to collections, the resident would pay the center's *collection costs*, including attorney's fees) (emphasis added). Thus, the Court finds that the words and structure employed within the Letter Agreement evidence the parties' intent to use the defined term Claim – which encompasses attorney's fees and other "costs of defense" – when formulating the Section 10.3 schedule of sharing of costs.

### C. Reconciliation of Letter Agreement Provisions

The Court must now examine Section 10.1, its reciprocal provision Section 10.2, Section 10.3, and Section 10.4 and its reciprocal provision Section 10.5. With the analysis being led by the plain language of the contract, the Court further looks to the structure of the contract, and the interplay of the contract provisions, in order to determine whether the contract contains an ambiguity.

#### i. Sections 10.1/10.2 and 10.3

Sections 10.1 (and its reciprocal provision 10.2) and 10.3 each reveal a particular set of triggering events, as well as designations of rights. Sections 10.1 and 10.2 of the Letter Agreement address the indemnification of each party by the other, specifying given sets of circumstances that trigger indemnification. Sections 10.1 and 10.2 dictate that a party can *only* seek indemnification from the other party with respect to Claims, when the liabilities, claims, suits, damages, losses, costs or expenses - including reasonable attorneys' fees and other costs of

defense are caused by the other party's Activities ("Activities"). Activities were defined separately for each party and listed in Section 10.1.[7]

However, identification of the triggering party's Activities does not end the examination, application, or *limitation* of Sections 10.1 and 10.2. The Letter Agreement further narrowed the scope and effect of the rights granted by Sections 10.1 and 10.2, by adding language regarding Claims that stemmed from bodily injury or death alleged to have been caused by the use of Permax. As evidenced by the placement of the language[8], purposeful separation and ultimate excision of this particular form of Claim, these 'sub-Claims' were treated differently. The question for the Court then becomes is it unambiguous from the face of the contract how they are to be treated.

Both Lilly and Valeant argue that the other's interpretation and reconciliation of the provisions renders at least one of them meaningless. Lilly argues that the parties' clear and unambiguous intent was to treat Product Liability Claims in a different manner than the Claims described in the indemnification provisions of Section 10.1 and 10.2. Lilly contends that when read as a whole, the terms of the Letter Agreement demonstrate that the parties intended for Valeant to share in the costs of the Product Liability Claims, with no consideration of whether it

---

[7] **Valeant Activities**: (1) Negligence, gross negligence, recklessness or willful misconduct; (2) Manufacturing, packaging, testing, use, labeling, storage, handling, promotion, distribution and sale of Permax; (3) Breach of representations, warranty, or covenant by Valeant under this Agreement or Letter Agreement; (4) Actions in connection with any aspect of Valeant's marketing activity for Permax.

**Lilly Activities**: (1) Failure of Permax to manufactured by Lilly to meet applicable specifications at the time of shipment from Lilly's facility; (2) Manufacturing, packaging, testing, use, labeling, storage, handling, promotion, distribution and sale of Permax (x) outside the Territory, or (y) within the Territory, prior to the date of execution of this Agreement; (3) Breach of representations, warranty, or covenant under this Agreement. Letter Agreement, para. 10.3.

[8] The "[P]rovided however, that any Product Liability Claims … shall be handled in accordance with the provisions of Section 10.3" language was placed directly behind the discussion of Lilly and Valeant 'Activities'.

involved a Valeant activity or whether Valeant had been dismissed on the merits of a litigated Product Liability Claim. Lilly supports this contention by citing to the language of the contract as well as the Letter Agreement's prescribing a share of the costs to Valeant for claims that were received by Lilly before Valeant was assigned the rights to license and sell Permax. Lilly further cites to the specific contractual language drafted to address allocation of costs for the B Claim, which provided for Valeant's sharing of a portion of costs associated with the B Claim, to which Valeant was not a party. Lilly asserts that the party's treatment of the B Claim reinforces that the cost sharing agreement is triggered exclusively by the date a claim is first made.

Valeant argues that under the plain language of the contract as defined in Section 10.1 of the Letter Agreement, it does not have an obligation to contribute to a settlement or judgment where Valeant has obtained a determination or judgment that an injury was not caused by a Valeant Activity and the settlement or judgment emanated from a "Lilly Activity" or Lilly's sole negligence. Valeant contends that Section 10.3 is a cost-sharing provision does not serve to supersede the indemnification provisions in Sections 10.1 and 10.2. Rather, Valeant asserts that its obligation to contribute pursuant to Section 10.3 is off-set by Valeant's right to recoupment under Sections 10.1 and 10.2. Valeant contends that it is not required to contribute to the cost of a settlement or judgment where it has been dismissed from the litigation because Section 10.3 does not contain clear and unequivocal language requiring Valeant to reimburse Lilly for its own negligence.

Delaware courts apply the well settled principle that contracts must be interpreted in a manner that does not render any provision "illusory or meaningless." *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *7 (Del.Ch. December 22, 2010); s*ee e.g., Schuss v. Penfield P'rs, L.P.,* No. 3132-VCP, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008); *OSI*

*Sys., Inc. v. Instrumentarium Corp.,* 892 A.2d 1086, 1090 (Del. Ch. 2006). Although the Court agrees with Lilly that Valeant's assignment of 25% of the costs of Claims first made between the dates March 22, 2002 and December 31, 2004 is telling, the Court's analysis of this issue does not end there.[9]

In direct contrast to Sections 10.1 and 10.2, where the applicability triggers were caused by "Lilly Activities" or "Valeant Activities;" Section 10.3 of the Letter Agreement begins its articulation with applicability trigger of "caused by use of Permax." This indicates that unlike Sections 10.1 and 10.2, where the determination of 'causation by a party activity' was the key concern, Section 10.3 would not use the activity as the triggering consideration. Section 10.3 sets out as the triggering event - whether the Claim [primarily related to bodily injury or death …] was *caused by the use of Permax*. This does not render Sections 10.1 and 10.2 meaningless. Rather, it distinguishes indemnification for costs of Claims *caused by the specified party activities* from the sharing of costs pursuant to the schedule in Section 10.3 of Claims generally *caused by the use of Permax*.

Valeant further urges that under Delaware law, an agreement reimbursing a party for its own negligence requires clear and unequivocal language and that the Letter Agreement does not provide for this reimbursement. *See generally, Fina, Inc. v. ARCO*, 200 F.3d 266, 270 (5th Cir. 2000). However, in making that determination the Court must look to the language of the contract. Here, negligence was addressed twice. Sections 10.1 and 10.2 of the Letter Agreement set forth Claims stemming from particular actions/activities that would and would not be indemnified. The Letter Agreement spelled out that negligence, gross negligence, recklessness, and willful misconduct would be indemnified by Valeant but would <u>not</u> be indemnified by Lilly.

---

[9] March 22, 2002 is nearly two years before the Letter Agreement was created.

This evidenced Lilly's intent to hold Valeant responsible even against its own negligence. Further, The Letter Agreement purposefully excepted out Product Liability Claims - Claims relating to bodily injury or death, which are inextricably linked to claims of negligence – and addressed them under a cost-sharing provision rather than under the indemnification provisions.

For the aforementioned reasons, the Court finds that the Letter Agreement unequivocally contemplated the sharing of costs of Product Liability Claims regardless of party negligence determination.[10]

### i. Sections 10.3 and 10.4/10.5

Valeant further contends that Lilly's interpretation of Section 10.3 conflicts with Sections 10.4 and 10.5. Valeant claims that these Sections specifically address how the parties are to defend claims and who is responsible for the attorneys' fees associated with defending those claims; specifically requiring a party to pay its own "cost and expense" where it chooses to control the defense of any claim. Section 10.4 is set forth below in its entirety:

> Lilly shall promptly notify Valeant of any **Claim** brought against Lilly for which Lilly *seeks indemnification* and shall permit Valeant, at Valeant's cost and expense, to respond to and control the defense of such **Claim**. Lilly shall have the right to participate in any defense to the extent that in its judgment, Lilly will be prejudiced thereby. In any **Claim** in which Lilly *seeks indemnification* by Valeant, Lilly shall not settle, offer to settle or admit liability or damages in any **such Claim** without the consent of Valeant, which consent shall not be unreasonably withheld. Lilly has advised Valeant of two asserted **Product Liability Claims**, and two as yet unasserted potential **Product Liability Claims**, in existence as the date of the Letter Agreement. Lilly confirms that those four matters constitute all of the **Product Liability Claims** of which it has knowledge as of the date of the Letter Agreement. *The parties' shall enter into a mutually acceptable joint defense agreement with respect to such claims.*

---

[10] The Court will not address Valeant's argument against the application of Section 10.3 to punitive damage verdicts rendered against Lilly in future Permax product liability claims because Lilly has conceded to a modification of its request for declaratory relief to include an exception to the parties' cost-sharing obligations for Product Liability Claims in the event that either party (Lilly or Valeant) is determined to be liable for punitive damages because of a reckless, willful or intentional act.

Letter Agreement, Section. 10.4 (emphasis added).

Lilly contends that the use of the word "Claim" in the first three sentences of Section 10.4 and not use the term "Product Liability Claims" is consistent with an intent to treat other claims differently than Product Liability Claims. Lilly maintains the parties' intended to share all of the costs of defense of Product Liability Claims in accordance with the formula in Section 10.3 of the Letter Agreement. Valeant responds asserting that Sections 10.4 and 10.5 apply to Product Liability Claims and specifically address who is responsible for the "cost and expense" – including associated attorneys' fees – where one party chooses to control the defense of any Claim.

Valent's proposition however ignores the key language of the first and third sentences of Section 10.4 of the Letter Agreement. Both sentences state as the triggering circumstance "Lilly/Valeant seeks indemnification." Again, "when interpreting a contractual provision, a court attempts to reconcile all of an agreement's provisions … giving effect to each and every term." *Schuss v. Penfield P'rs, L.P.,* 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008). As previously discussed, under the terms of the Letter Agreement, Product Liability Claims are excepted from indemnification. Therefore sentences one and three of Section 10.4 refer exclusively to Claims and not Product Liability Claims.

**Remaining Issues**

Lilly's Motion for partial summary judgment dealt specifically with the determination of the triggering of Section 10.3's responsibilities regarding Product Liability Claims, and what costs are to be included in Section 10.3's schedule. The Court has adequately addressed each of these declaratory requests. Valeant brought forth the following issues in its Response: 1) allegation that the Letter Agreement lacked consideration, 2) government of the Letter

Agreement by the Uniform Commercial Code, 3) reasonableness of non-joint representation counsel fees, and 4) equitable defenses. The Court has reserved ruling on the above arguments. This order is narrow in its application and Court addressed only the issues of costs and the interplay of Sections 10.1/10.2, 10.3, and 10.4/10.5, as plead in the Plaintiff's Motion for Partial Summary Judgment (Dkt. 44). The Court finds that Valeant's additional argumentation provided in its briefing is suitable for later stages of trial and therefore, will not be addressed in this Entry.

## IV. CONCLUSION

Ultimately, when interpreting a contract, the court looks to the relevant document, read as a whole, in order to determine the parties' shared intent. *Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *7 (Del.Ch. December 22, 2010). The Court finds that as evidenced by the plain reading of the contract the intent is clear and unambiguous: 1) cost-sharing obligations are based exclusively upon the date on which either party first receives written notice and such obligations survive Valeant's dismissal or otherwise prevailing on the merits of a litigated Product Liability Claim and 2) the costs of the Product Liability Claims that are to be shared include: amounts paid in settlement of the Product Liability Claim, any judgment entered against Lilly and/or Valeant in the Product Liability Claim, and the costs of defense incurred by Lilly and/or Valeant in connection with the Product Liability Claim, including attorneys' fees, expert fees, and expenses. Thus, partial summary judgment in favor of Lilly is warranted.

For the reasons stated herein Plaintiff Eli Lilly and Company's Motion for Partial Summary Judgment (Dkt. 44) is **GRANTED**.

SO ORDERED.

Date: 02/14/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

16

Distribution to:

**Elizabeth Abbene Coleman**
JENNER & BLOCK, LLP
ecoleman@jenner.com,docketing@jenner.com,cmurray@jenner.com

**Larry Gene Evans**
HOEPPNER WAGNER & EVANS LLP
levans@hwelaw.com,llangbehn@hwelaw.com

**Audra Jae Ferguson-Allen**
ICE MILLER LLP
audra.ferguson-allen@icemiller.com

**Casey T. Grabenstein**
JENNER & BLOCK LLP
cgrabenstein@jenner.com

**F. Joseph Jaskowiak**
HOEPPNER WAGNER & EVANS LLP
jjaskowiak@hwelaw.com,tbugajski@hwelaw.com

**Mary Nold Larimore**
ICE MILLER LLP
larimore@icemiller.com,kennedym@icemiller.com

**Kimberly C. Metzger**
ICE MILLER LLP
kimberly.metzger@icemiller.com,Tonya.Thompson@icemiller.com

**Phillip R. Scaletta**
ICE MILLER
scaletta@icemiller.com

**Rebecca J. Seamands**
ICE MILLER LLP
seamands@icemiller.com,alley@icemiller.com

**Lise T. Spacapan**
JENNER & BLOCK, LLP
lspacapan@jenner.com

**Nathaniel M. Uhl**
ICE MILLER LLP
nate.uhl@icemiller.com,Shannon.Waggoner@icemiller.com

**Melanie F.A. Vitalis**
ICE MILLER LLP
melanie.vitalis@icemiller.com,tonya.hill@icemiller.com

**L. Alan Whaley**
ICE MILLER LLP
whaley@icemiller.com